May it please the Court, David Cole for the Humanitarian Law Project. I'd like to reserve four minutes of my time for rebuttal. This Court, in its prior Humanitarian Law Project litigation, has recognized that Congress has a legitimate interest in cutting off funding for terrorist organizations, but has insisted that it must do so pursuant to carefully defined terms and limits in order to avoid infringing on protected speech and association. The material support law at issue in the prior Humanitarian Law Project litigation, 18 U.S.C. Section 2339B, authorizes designation only of groups that actually engage in terrorist activity, criminalizes only knowing support to those groups, and critically defines the key terms in the statute, namely terrorist activity, terrorist organization, and material support. This Court, in the prior Humanitarian Law Project litigation, found all those factors critical in upholding aspects of that law, and at the same time struck down those provisions of the law that seemed to infringe on speech, the training provision, expert advice provision, and the services provision. The laws challenged here, the International Emergency Economic Powers Act, which I'll call IEPA, and Executive Order 13224, contain none of the limits that this Court found so critical in upholding aspects of 2339B in the prior Humanitarian Law Project litigation, and use equally vague, and in some instances more vague, terms than those struck down by this Court in its prior case law. Under this scheme, the President can designate any individual or any group without any finding of any wrongdoing, much less terrorist activity. The statute itself not only doesn't define, but doesn't even mention the terms terrorist activity, terrorist organization, or material support.  that have never engaged in any actual terrorist activity, and prohibits terms like services, which this Court has already held unconstitutionally vague, and material support without any definition. You're not designated. No, we're not designated, just as we weren't. I'm not quite sure what point you're making that you have standing to make. Oh, I think standing, Your Honor, is the same standing that was at issue in the prior Humanitarian Law Project. We weren't designated in those cases either, but we wanted to prove it. No, no, but I just want to know what you're focusing your argument on, because you've got challenges to the Act, you've got challenges to the delegation from the President to the Secretary. So what are you focusing the point you're just making on? Right. What I'm focusing on is that what we are challenging is the President's authority to designate and the Secretary of the Treasury's authority to designate, because those authorities to designate impose the same kind of chilling effect on our activity as did 2339B, thus authorizing our ability to have standing to challenge those provisions in a pre-enforcement context. I'd like to turn first to the President's designation authority. You better talk about standing in connection. Yes, I will. Why don't you just pick up standing? Yes, let me start with standing. Why don't you start? I will. I will, Your Honor. The district court initially found that we had standing and initially found that the President's authority was so open-ended as to be unconstitutionally vague. The district court reversed itself on a motion to reconsider, finding that it was unlikely that we would be targeted by the President's designation authority, and critically, that the standing approach that she had applied in 2339B, that this Court has applied time and again in First Amendment cases, did not apply here. It did not apply here because, as she read it, the International Emergency Economic Powers Act did not, on its face, target First Amendment protected speech. But what this Court has said in the California pro-life case is that if a statute on its face arguably covers Yes, and that is just plain coarse stuff there, as I recall, is contributions having to do with ballot. That's right. And you can search forever and not find that in this Act. Well, I wouldn't say you won't find ballot issues in this Act, You will find association on the face of the very executive order that the President issued pursuant to IEPA. That's skipping a beat here. We're back to whether the President's got authority. Well, I don't think it's Whether you've got standing to question that issue. Right. And I don't think it's skipping a beat for the following reason, Your Honor. In order for the President, the President's authority stems from two sources, IEPA and his declaration of a national emergency. Without a declaration of a national emergency, there is no authority to designate. And so it's Executive Order 13224 plus IEPA that gives them that authority. Executive Order 13224 on its face says that anyone who's associated with anyone else on the list can be designated. So that's on its face, direct of association. In addition, the government argues that this executive order is pursuant to the U.N. Protection Act, which in turn is enforcing a U.N. Security Council Resolution, which in turn authorizes designation based on mere association. So even if you accept that the statute on its face has to target speech or association, the legal authority of the President, which is IEPA and 13224 combined, targets association on its face. And that's not what this Court said in California Pro-Life. It didn't say because the statute targets association on its face. What the Court said was if a statute, if a plaintiff seeks to engage in First Amendment-protected activity and the statute arguably covers that activity and it's being enforced, he can come forward before it's enforced against him and bring a lawsuit. And indeed, courts have repeatedly given pre-enforcement standing to statutes that have no reference to speech on their face whatsoever. In Steffel v. Thompson, the Supreme Court. There were a ton of threats there. I mean, it was perfectly clear that enforcement was threatened. Well, and in this case, it's absolutely clear that enforcement is threatened. Is there any indication that HLP has ever been threatened with being designated or with anything else under that? Well, again, they haven't been personally threatened. And this Court has held in California Pro-Life and other cases that you don't have to show that kind of personal threat. All you need to show is that you engage in conduct that is arguably covered by the statute, that is arguably protected by the First Amendment, and that the government is enforcing the statute. And this is a statute that has been enforced by the President. It's been enforced by the Secretary of the Treasury. The President's designations continue in force to this day. He hasn't disavowed this authority. He's exercised it on 20 and a half days. I'm not up in the air. I'm asking where in the record is there any indication that any hint of enforcing the statute or putting HLP as a designated terrorist, whatever the term is, has ever been made? Again, it's precisely the same as in HLP-1, HLP-2, HLP-3, and HLP-4. There was no personal threat of prosecution in any of those cases, and yet this Court on three occasions, the lower court on four occasions, has granted standing to review. Why? Because the plaintiffs seek to engage in activity that has been defined by the law as proscribed, and they believe that activity has protected First Amendment speech. But if they engage in it, they face, under this statute, the threat of being shut down forever on the basis of without a hearing, without a statement of reasons, et cetera. Well, their associational rights and their freedom of speech rights are being threatened and chilled and all that. That's right. And, again, this Court in California pro-life quoted Judge Posner from the Seventh Circuit, saying, again, it's precisely there need be no individual threat because the harm is created by the existence of the statute. My clients come to me and say, look, we see this statute. We see this executive order. They've designated the very groups that we were providing support to before. We believe the support we were providing to them before was constitutionally protected, but we can't engage in it because if we engage in it, we could be shut down, all our assets frozen, all our transactions criminalized. So you would have a remedy at that point. At that point, right. But what the pre-enforcement cases say is that you don't have to wait until that point precisely because, as Judge Posner said and as this Court said in the California pro-life case, the concern is that plaintiffs in my client's situation won't go ahead and engage in their First Amendment protected activity. They will be deterred from doing so unless a court says they have the right to do so. And, again, that's why we came to this Court in the prior Humanitarian Law Project cases, and in every case the Court said that's right and we will, therefore, tell you what you can and can't do. But our clients are now in a position where this Court previously said you can provide training, you can provide services. In each of those prior cases, we've also made it very clear that what's being controlled here is conduct and not speech. That's right. And where – I'm sorry. Go ahead. And where – and what the Court has said, though, is that where a provision does, in fact, encompass speech, we will strike it down. And so the services, expert advice, and training provisions have been struck down. And, again, just to – Which now – now that we've established the principle, the question would be where does it do that? Where does this statute do that? Where does this statute – okay, well, with respect to the President's designation authority, he has indicated through Executive Order 13224 that he can designate for pure association. With respect to the Secretary of the Treasury's designation authority, he has delegated to the Secretary of the Treasury the power to delegate for the provision of services, a term this Court has already held unconstitutional, and material support. The term was defined in this one, whereas it was not before. Well, it – So you've got a very clear, very easy-to-understand definition of what services mean, legal services, accounting services, financial services, things of that sort, which are sort of fungible provision of – Well, actually, you know, and that is what the district court said. But with all respect, the regulation at issue doesn't so much define services. In fact, the government gives a separate definition of services in the statute, because the regulation, all it does is provide examples. It says examples, and then it says examples, legal services, educational services, public relations services, and other services. So the question is, what's a service, and what does the government say? Because it's all services. It's not just those. And the government says a service is any act done for the benefit of an organization. Any act done for the benefit of an organization. That's what it provides at its brief at page 35. Meaning you make an attempt or you conspire or – Meaning you do anything. I mean, meaning you – I mean, some of the things that our clients would like to do, for example, is advocate for the rights of the Kurds in Turkey, and particularly for the legitimacy of the PKK to represent the Kurds in Turkey. Well, is that an act done for the benefit of the PKK? No, independent advocacy is not included. I mean, there's just no question about that. Well, I think that with all due respect, I think there is a question about that. Well, if there is a question, we can clear that up. That's an easy cure. All we have to do is write an opinion that says independent advocacy is not included. That gets you home free on that. Well, Your Honor, I'm not sure it's that simple. I mean, in HLP1, the government made exactly the same argument. There was a provision that banned the provision of personnel to designated groups. And they came forward and said, well, personnel means acting under the direct control of the organization. It does not include independent activity. And what did this court say in HLP1? It said, we don't see that anywhere in the statute. We can't rewrite the statute. That's for Congress. And so it struck that provision down. It then went back to Congress, and Congress then redefined personnel and put in a definition, which this court in HLP2, I'll call it, HLP versus Mukasey, held was permissible. So I think under that precedent, Your Honor, you can't actually read in this independent advocacy exception because it doesn't appear anywhere in IEPA, it doesn't appear anywhere in Executive Order 13224, and it doesn't appear anywhere in the regulations. So what's more, if you do read it? In order to avoid a constitutional issue, we can't construe an ambiguous term in a way that would avoid it. We have to strike it all down. Well, again, according to this court's precedent in HLP1, unless you're going to break from this court's precedent in HLP1, I don't think you can, number one. But, number two, I don't think it cures the constitutional problem. And here's why. If the government says to my clients, any act done for the benefit of a group will subject you to being designated, but independent advocacy on behalf of the group is okay, how am I supposed to determine whether, for example, lobbying in support of the PKK's legitimacy is an act done for the benefit of the group, which will lead to their being shut down, or independent advocacy on behalf of the group, which the government says without any criteria is somehow permitted. So even with that independent advocacy exception read in, which I think under HLP1 the court can't read it in, but even if you did read it in, it simply exacerbates that vagueness of the services provision. Finally, I'd say with respect to services, I'd point this court to what this court said in HLP v. Mutasi with respect to services. Struck it down, and I quote, because it is easy to imagine protected expression that falls within the bounds of the term services. Well, even as they have defined it, and even with independent advocacy, it is easy to imagine protected expression that falls within the bounds of the term services. If my clients provide a training in human rights advocacy, which is what they were doing before it became illegal to do so, that's a service. It's clearly protected. This court has, in both prior cases, said that that is clearly protected expression, and yet it is covered by services. Therefore, under HLP v. Mutasi... Well, does your advocacy today fall within... Well, it could, Your Honor. In fact, the only reason that my own advocacy... Well, that my own advocacy might not is because there's a separate provision which gives an exemption for legal services of certain kinds. And so maybe my advocacy is legal services exempted. But again, that's totally up to the discretion of the government. Let me turn to the material support provision. Well, the examples include provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services. That's right. But then there's another regulation. Right. That's right. There's another... It says except as pursuant to other provisions, and another provision has it. Let me turn to material support for a moment because the executive order also allows the government to designate based on the provision of material support. That, of course, this Court upheld in the 2339B context because it was defined by a, you know, 15-line paragraph that specifically defined material support. Here, by contrast, there's no definition of material support whatsoever. And the district court in the Al-Haramain case, which I provided for Your Honors just a couple of weeks ago, declared that provision unconstitutional, applying this Court's HLP decisions because it's unconstitutionally vague. And here's what the government said it means. They said material support means any act that promotes the interests of a group and has real importance or great consequences. That's what they said in their opening brief in the Al-Haramain case. In their reply brief, they said, well, it also could mean any act that has the natural tendency to affect the organization. Now, again, and what the district court in Al-Haramain said was that that's clearly unconstitutionally vague. How is my client supposed to determine whether their advocacy or their educational services or their medical treatment is of real importance or great consequences? If it's of real importance or great consequences, they can be shut down tomorrow. If it's of insignificant importance or minor consequences, they're somehow protected. Is there any mechanism where you can get an advisory opinion before you do something? There is a call-in line, yes. But, again, but no court has ever upheld an otherwise unclear, vague statute that applies to the general public because there's a call-in line. And the reality is, Your Honor, is that the only situations in which courts have said that the ability to – that there's a little more leeway is where you have a regulated industry and you have a sort of continuing regular contact, the FAA in Santa Monica perhaps, but not the general public. The general public's not going to call up OFAC and say, You know, I'm thinking about giving support to a specially designated global terrorist. Can you tell me whether it's permitted or not? That's just not going to happen. What's going to happen is that they're going to be chilled from engaging in that activity, and for that reason the courts have never said that a call-in – But that's what you're there for. They come to you, and you could say or write a letter to the secretary and say, Can we do this? Because we're not sure exactly what these words mean. Well, again, you know, with any statute, you could write a letter to the prosecutor and say, You know, my client wants to engage in this conduct. Is it annoying in your view under the, you know, the city of Cincinnati versus Coates ordinance? And the prosecutor could say, No, I don't think it's annoying. Go ahead and do it. The Supreme Court in that case didn't say, Well, since you could write in to the prosecutor, we will strike this down. What they said is the statute has to provide clear enough guidance so a person of common intelligence looking at the terms can know what's permitted and what's not. And the fact of the matter here is that just as in HLP versus Mukasey, just as our clients could not determine whether their conduct would be permitted or prescribed with respect to training, services, and expert advice and assistance, the same is true with respect to services and material support here. And just as this Court in those cases struck those provisions down, and I quote, Because they would encompass protected expression, so too the services and material support bans here clearly cover, encompass, could encompass protected expression, and therefore on the strength of HLP versus Reno and HLP versus Mukasey, those provisions I believe have to be struck down. Well, the bottom line of your argument is that you have standing because there's a real threat, significant threat, arguably a threat, that your clients, by exercising their First Amendment rights of speech and of association, will be the target of action or could be the target of action by the government, and that discourages them greatly from going ahead with, for example, providing medical care for children, physicians going over there and helping people who have suffered grievous wounds or sending food over there, or even engaging in public relations that, for example, would set forth the side the Kurds are advocating and what their position is and what their history has been and all the rest of it. Those are the injuries that you perceive, and your argument is that those are real and that at the very least you ought to have standing. Absolutely, Your Honor. That's what you say. That's right, and I would add to that. We have a client who was distributing LTTE literature and would like to continue to do that. Now, that's clearly protected speech. There's nothing unprotected about that literature, but if they do that, would it be deemed as services? Would it be deemed as material support, an act with great consequence or an act that has the natural tendency to affect? And if so, the next day they could be shut down forever without a trial, based on secret evidence, without even a statement of reasons from the government under this statute. And face criminal prosecution. Well, and potentially face criminal prosecution, but in some respect the more serious, the more grave consequence here is that the organization can be shut down entirely without a criminal trial. And in that respect, too, this statute is much more sweeping and imposes a much more extensive chill on First Amendment protected expression than 2339B, which this Court has already found to be unconstitutional in certain respects. Because at least with 2339B you get a trial, you get notice, they have to put the evidence on the table, you get to defend yourself. With respect to this scheme, they can designate an organization and shut it down without ever giving you any kind of a trial, without showing you the evidence, without even telling you why you were shut down, and without giving you any statement of reasons. And so the way in which this statute is enforced, and it's been enforced so far against about 10,000 individuals and groups, is vigorously enforced. And nobody knows why any of those groups were designated or shut down because they don't give any reasons. And so what you do is you look at the law, and you look at the executive order, and you see, well, here's what they've said, association support. You might start by looking at the list. Well, you could, but it has 10,000 names on it, Your Honor. And you can't, you know, sure, Al-Qaeda, we know Al-Qaeda, right? But that's one. But what about the other 9,999? And, you know, you literally cannot know why these groups have been designated because they don't say. And so that, I think, also exacerbates the challenge. I mean, the bottom line here, Your Honor, is that, again, it's perfectly legitimate for the government to seek to cut off funding to terrorist organizations. They've done so since 2010. That's a practical question about the licensing scheme. I at least superficially understand that you can just apply for a license to do X. Yeah. Yeah? Yeah. So, I mean, doesn't that beat a call line? I mean, if you're on the margin and you have a real serious concern that you're going to run afoul of the strictures of the act, of the regulations, can't you seek permission to do it? Well, Your Honor, you could seek permission to do it under 2339B in this court. The court nonetheless found the services. You're asking the question whether you can do it. Right. And you can do it. And I'm saying, yes, you can do it, but under HLP v. Mukasey, that cannot be an answer. Because if it were, then HLP v. Mukasey would have to be reversed because the same opportunity was available there, and the court held that it was insufficient. So unless you're going to reverse, which, of course, one panel can't reverse another panel's decision, that can't be an answer, number one. Number two. It's not final yet, is it? It hasn't been. There's been no grant of en banc. But number two, Your Honor, the government can't criminalize or penalize protected speech and then say, but you can come forward and ask us in our completely unfettered discretion whether we'll give you the opportunity to engage in prohibited speech. That's what this licensing scheme is. The licensing scheme has no standards whatsoever. All it says is you can apply for a license. It doesn't say under what conditions they can grant it. It doesn't say under what conditions they can deny it. No, that's not true. That really wasn't my question. No, but I think it's, with all due respect, Your Honor. I don't think you have standing to question the process and the licensing scheme. So you haven't ever applied for one in whatever. I just was asking whether that wasn't. And I'm just giving, right, and I'm just giving Your Honor the reasons why, even though one could, in theory, apply for a license under this Court's precedence, that does not save an otherwise unconstitutionally vague statute from invalidation. Thank you very much. Thank you. Please, the Court. I'm Douglas Sletter from the United States Department of Justice, and we are urging that this Court affirm the district court's decision. In this instance, the district court got it right. My friend, Professor Cole, has made a number of points, and the Court has asked a number of questions. I'd like to address all of them, and I believe I can. I think they're standing here. Your Honor, that is absolutely wrong because Professor Cole has confused a batch of things. So if I may, Your Honor, I'd like to say Professor Cole has confused a batch of issues here, and I'd like to get it, break it down, and we can get it straight. First, just if I may, Judge Corman, you asked about the can you seek advice, and it's much more than a call line, and Professor Cole knows that. There's an entire website. You can seek advice. And, in fact, OFAC, Office of Foreign Assets Control and Treasury, gets requests and issues advice thousands of times a year under the various programs. So this isn't just some very unknown sort of thing that the agency never does. Is that advice published, by the way? Is that advice published? Not to my knowledge, although I'm trying to think if one could. I think the problem is if one filed a FOIA request for it, there would have to be all sorts of things deleted because of privacy concerns. So you probably could, maybe the agency could disclose, pursuant to a FOIA request, certain advice that's given. But, as I say, you'd have to delete all sorts of things for privacy. You call up an agency and you've got a legal question, can I do this or can't, and you're telling me that you're going to get an impartial answer and that you're not going to get an answer that's equivocal or one where whoever answers it is not going to stick their neck out.  You call up companies and try to get information and you can't get it. Can I get it out of the government? Yes, absolutely, Your Honor. Absolutely. I guarantee it. This is a program that the government implements. It's an extremely important program. We have a whole range of sanctions. As I said, we get thousands of inquiries a year and we respond to them. Give me an example. People all the time call and ask. There are very complex restrictions on trade with Cuba. We get questions constantly on can I travel to Cuba under the following circumstances. Forget about Cuba. It's the same here. People don't have any problem getting to Cuba. They go to Canada. That can be, Your Honor, we sanction people who violate the Cuba travel restrictions and you want to have dealings with certain Iranian companies or certain when there were restrictions on Iraqi companies. Your Honor, I guarantee we respond to thousands of inquiries. So, no, we need to make this program work. Nobody has any interest in shutting down legitimate activity and so this is a real advice program. What about a person or an organization that wants to, say, go into Kurdistan and provide medical care for children, for women, or people who have been injured? Is that permissible? Your Honor, I don't personally remember if we have sanctions program involving Kurdistan. I don't know the answer to that. We've got a group that advocates for Kurds. Oh, Your Honor, and again, this is where Professor Cole, I think, has not given you a complete answer. Remember, this scheme bars providing services and support to designated organizations and entities and individuals. So if you want to go to Kurdistan, if Kurdistan is not designated, I don't think it is, you can provide medical support to Kurdistan children. That's not what this program is about. If instead you want to provide money, which is what Mr. Cole's clients want, and training, et cetera, to the LTTE, the Tamil Tigers, a recognized, very dangerous terrorist organization, that's a different story. If all you want to do is provide medical care to Tamil children, that's not what this statute is about. That's not what this is about, and that's why when Your Honor asked the question... So if you want to provide medical care to children of Tamil Tigers, that's all right. If you are providing medical care to Tamil children, that's okay. If instead you want to provide training to the Tamil Tiger doctors who are paid for, et cetera, by the Tamil Tigers, you are providing support, services, et cetera, to a recognized, dangerous, violent terrorist organization. These are completely different issues. Your Honor also asked about, in your question, you said you could be prosecuted too. Again, Mr. Cole left out. Prosecuted under this statute specifically has a willfulness requirement. I know that because that was in conformity with a decision I made, and the statute was then amended. No, I don't think so, Your Honor. This statute has been around since 1977. I know, but I'll send you the opinion. Okay. I'm not aware that the willfulness... I may be wrong, but I think the willfulness has been in the statute since it was originally enacted in 1977. But I may be wrong about that, Your Honor. But in any event, the point is, you can't be criminally prosecuted unless you willfully violate the law. Confusion, et cetera, that's not willful violation. Lots of people from the Justice Department argued before me that there was strict liability in this situation. No, Your Honor, absolutely not. In criminal prosecution under this statute? Willful. It was strict liability. I'm sorry, Your Honor. I don't know of any cases where we have ever prosecuted somebody for willful violation of this statute under strict liability. That would be directly contrary to the wording of the statute. I can't imagine any jury would ever convict somebody if there was strict liability and the statute required it. Well, no judge would let it go to trial. But I don't believe under this statute, Your Honor, that is correct. But the statute did not have a mens rea provision, and the argument was that that was not necessary because this violation of this statute knowingly or unknowingly was criminal. Your Honor, again, this statute is not a knowing requirement. That's 20 through 39. This has a willful. I'm not talking about this statute. I'm talking about an argument that I heard in the past. I'm sorry, Your Honor. I'm not aware of. As I say, this statute has a willful requirement. The Supreme Court has told us what willful means. And so nobody's going to be prosecuted under this statute for being confused. That's just absolutely clear. That's not what this statute provides. Now, I want to address the standing point. Remember, you've got to break this down because, again, I think Professor Cole lumped it all together. There is first an argument that they can attack the President's designation authority. The district court held there is no standing to attack that. Forget the Secretary for a moment, Secretary of Treasury. We're talking about the President's designation authority. As I say, the district court held there is no standing. Why? Because the President in 2001 designated, I think it was 27 organizations, that are all themselves clearly tied in with terrorism, individuals and organizations. You can look at the list. It's attached to the executive order. It's like al Qaeda, et cetera.  The President has made no designations since that time. Therefore, the district court correctly held there was absolutely no reasonable threat that the President, under this executive order, was now suddenly going to designate a domestic organization or individuals. None of the organizations on the list otherwise that we are aware fit that description. That the President is now, six years later, going to suddenly reach out and designate these organizations. The district court correctly held that is not right and there is no standing. So there is no reasonable threat. And, again, Professor Cole hasn't given you any reason to think there is a reasonable threat. So let's put the standing to attack the President's power aside. Because it seems to me that's clear. There is no standing. As far as attacking the power of the Secretary to make designations, we haven't argued there's no standing for that. They do have standing for that. The district court rejected that claim on the merits because their claim is that the provisions are too vague and services seems to be the main focus. The district court pointed out that, remember, it's the same district court judge as in the 2339B case and she explained why the two are different and it has to do with the examples. The argument could be, what Professor Cole can attempt to argue is, if there were a designation, it would be invalid. But it's not vague. At this point, the district court was quite correct that it's not vague. Mr. Cole then made it sound like if there is a designation, it will be secret, that's it, etc. I'm baffled because, as we know, from the cases, you can bring, if you want, you can challenge a designation. The IARA case, the Holy Land Foundation case, these are then litigated. We come forward, we produce the record supporting the designation. Some of it is classified. That goes to the district court, ex parte in camera, but if you look at the designations that have been upheld, these have been upheld by the D.C. Circuit, by the Seventh Circuit. The decisions are made primarily and, in some instances, universally on the basis of evidence that we make public. So these aren't some sort of star chamber. You're designated. You have no idea why. End of story. That's just not the way it works. Professor Cole was mentioning about the license procedure. He was saying that it's the same as under the OEDPA, the other statute. It's not. There's much more limited things that can be licensed under that statute. Professor Cole was mentioning the Al-Haramain case, the district court decision there. And, by the way, that's not a final judgment. The court has there asked for further briefing on various issues, which we are providing. And there obviously could be appeals. I'm fairly sure that the plaintiffs here have not challenged the definition of material support. It's not in the briefs. So, yes, the district court in Al-Haramain, we believe incorrectly, found that material support is too vague a term. But that term, to my knowledge, has not been challenged in this case. So I don't know whether Professor Cole is amending the complaint here, but I don't believe so. As far as the right to associate, this court and the D.C. Circuit have, in a batch of opinions, been quite clear. There is no First Amendment right to associate with terrorist organizations, even if what you want to do is provide them support, not directly for terrorism, but other aspects. As we point out, this court in Humanitarian Law Project, the D.C. Circuit, and Holy Land Foundation, and then more recently. I don't think anybody is arguing that that type of conduct should be forbidden. Actually, that is what the plaintiffs are arguing, that they have a right to donate money and other services to the Tamil Tigers, as long as they do not have a specific intent to assist terrorism. That is precisely what Professor Cole is arguing. That's precisely the argument in their brief. It's wrong, but that is exactly what they are arguing, Your Honor. This court has rejected that in the other H.L.P. litigation. The D.C. Circuit has rejected it. We gave the court recently an opinion by Judge Posner, the Hussein case, pointing out why that is so flawed, that any assistance to these organizations helps their broader terrorist goal. Well, that's an all-encompassing argument, and one that really would preclude aid to children who are maimed, or women who need help, or people who are starving, or whatever. No, Your Honor, it does not. Again, as I say, you can provide medical assistance to children, women, you can provide food. You cannot provide services or material support to a designated terrorist group. Those are completely different. If what you say is you want to go over to Sri Lanka and provide medical assistance to children and women, you can do that. You can't provide training or give money to a Tamil Tiger hospital. Children of Tamil Tigers, can you provide medical care for them? It's very difficult for me to see, Your Honor, how that would be providing material support or services to the Tamil Tiger organization. And so unless those children are themselves designated, which I'm not aware that we've ever designated any children. And could you send money over there to be used by physicians and medical personnel who are not connected with the Tamil Tigers to go into that area and seek to help these children? Absolutely, Your Honor. Absolutely. You cannot provide services or money, material support, to what's designated on the list. You're talking about children of Tamil Tigers. Again, what I'm saying is I'm not aware of any children who have been designated. So, yes, that's not what this program is about. It's essential to understand this is about you can't provide aid to this extremely violent, dangerous terrorist organization. Nobody is saying you can't provide medical assistance to a child. The question of independent advocacy, I'm not going to say much on it because we have made absolutely clear that is not what we believe is covered by statute. The district court fully accepted that in its published opinion. We're not appealing that in any way. The district court made that decision based on statements from us. You're saying that their argument that somehow their First Amendment associational rights and their right to expression, that's just a specious argument. Yes. If they're truly humanitarians and they want to help people who are injured as a result of war or whatever, lack of food, they can go any place in the world and do that. They can even do that among people, families that are connected with the Taliban or the Tamil Tigers or some of these others. That would be okay. Is that what you're saying? Yes, Your Honor. What you can't do is if there is a Tamil Tiger hospital and you want to provide money for the Tamil Tiger hospital or a hospital controlled by the Tamil Tigers, that you cannot do. Or the Hamas or Hezbollah. Pick your terrorist organization. The Taliban. You cannot do that. But if the Tamil Tigers will let you into this part of Sri Lanka and completely on your own, not through their organization, treat women, injured women or starving children, absolutely yes, Your Honor. You may do that. When you say can, if the Tamil Tigers will let them go in. Yes. Yes. Yes. I'm not sure how much more I can emphasize this. Yes. You can't. If the Tamil Tigers say we will only. Okay. I hope I've got you sold, Your Honor. I think maybe I can see that the court is ready for this to be done. So I'll just add one more point. The thing we think the district court really got right is its approach to this problem. The district court citing this court's decision. So this wasn't just something the court made up. The district court made up in, for instance, gospel mission case, California teacher's case. The court makes clear that in a vagueness challenge like Professor Cole is raising, you can come up with examples on the margins. You can come up with very difficult little questions about can we do this, not that. The district court said, but even where a statute clearly implicates free speech rights, the statute will nevertheless survive a facial vagueness attack as long as, and here the district court is quoting this court, it is clear what the statute prescribes in the vast majority of its intended applications. And again, I'm reading from the district court decision, which is relying on this court's own published opinions. That is exactly the problem here. The vast majority of its intended applications, it is absolutely clear what this scheme prohibits. And so coming up with little examples here and there, which they can get advice from, they can seek alike. Let me ask you this, just a couple of statements. Is there any case law that you know of for the proposition that First Amendment standing is only implicated by a statute which facially implicates speech? Your Honor, I thought that this court said that in the California teacher's case. That was my memory. In the city of Oakland case, and by the way, this is dealt with at pages, I believe, 37 and 38 of our brief. So I think that is where we discuss those issues, Your Honor. So, for example, we wrote in the brief there, as this court has recognized, quote, a party challenging the facial validity of an ordinance on vagueness grounds outside the domain of the First Amendment must demonstrate that the enactment is impermissibly vague in all its applications. That's city of Oakland case. And so, as I say, in the California teacher's case, I think addresses this as my memory. Thank you, Your Honor. If the court has no further questions, I think I've probably tried your patience enough. No, you haven't done that. Okay. Thank you, Your Honor. At least I could hear you, and you've got some passion to your voice. All right. Thank you, Your Honor. Your Honor, could I respond with two points? Yeah, okay, Professor. First, with respect to Mr. Leder's last point, the city of Oakland case has nothing to do with standing. It's about the standard applied on the merits. There is no case that says that the First Amendment standing, pre-enforcement standing doctrine that we rely on here somehow doesn't apply to a statute that on its face doesn't target First Amendment speech. And I cited Steffel v. Thompson in the colloquy with Jen Reimer. There's also the Nunez case, which was a curfew ordinance that this court held was permissible to be challenged on First Amendment grounds, pre-enforcement, not because the curfew said anything about the First Amendment or speech, but because it affected, arguably, First Amendment-protected activity. So I think the standing doctrine is quite clear. Mr. Leder has not cited a single case to respond to. With respect to your question about the knowing, it was Mr. Leder himself who took the position, Your Honor, that 2339B prohibited support, even non-knowing support, to a terrorist organization. This court in the HLP v. Department of Justice, I think, case said no knowledge is required. Congress responded by putting a knowledge requirement in there. But what's critical here is that there is no knowledge requirement here except for criminal prosecutions. And as I said before, our concern is that we're going to get all of our assets frozen. We're going to have the organization shut down. That's worse than a criminal prosecution, and that can be done without any showing of knowledge whatsoever. Mr. Leder says the government concedes that we have standing to challenge the Secretary of the Treasury's designation authority. I think it follows from that that we have standing, also, to challenge the President's designation authority because, after all, the Secretary of the Treasury's designation authority derives from – it is dependent upon – the President's designation authority. So if the President's designation authority is invalid, then, by definition, the Secretary of the Treasury's designation authority is invalid. So that conception means that we have standing to challenge both the President's and the Secretary's designation authority. We have challenged the material support provision. I can cite and honor to the complaint, paragraph 1, where we talk about this scheme prohibiting the provision of services and other forms of support. Paragraph 44, services and other support. Paragraph 68 of the complaint, we are deterred from providing services, support, and humanitarian aid. The second cause of action, unfettered discretion to designate. Why? Because the Secretary can designate based on things like material support. The third cause of action argues that the statute is invalid because it authorizes the Secretary to designate based on material support. We argue that in our brief as well at pages 31 and 32 of the opening brief, page 14 of the reply. And the government responds on material support at page 45. So the notion that we haven't challenged material support when we have argued that the entire designation authority of the Secretary is insufficiently defined to satisfy constitutional scrutiny. And a core of that is this material support term, I think, is meritless. We do make a specific intent argument, Your Honor, but we recognize that this Court has decided that in HLP1. And so we're just preserving that for further appeals. But the principle argument before Your Honor today, it's not a specific intent argument. It's an argument about the vagueness of these provisions. And at the end of the day, it just is the case that it is not clear that, for example, the conduct that you just had ecologically with my colleague, Mr. Letter, would be permissible. So suppose my clients want to, as they said, they want to provide support in LTTE-controlled areas to people who were devastated from the tsunami or who want to provide medical support. And they can only do that by working with the LTTE. Well, if that support is treated as an act that has the natural tendency to affect the LTTE, because, for example, it's providing aid in an LTTE area, it would be prohibited as material support. If it is considered an act that because presumably they might be required to provide it and that by your organization providing some of them, it frees some of their resources to engage in all sorts of mischief. That's right. And they've made that argument time and time again. Mr. Letter, in the last argument, said we want to make these groups radioactive. We don't want you to provide any kind of support whatsoever that in any way benefits them or even strengthens their legitimacy. And the problem with this statute and the problem with this executive order is it's not limited to support or services provided to these groups. It also makes it a proper basis for designation if you engage in a service that is done, quote, it says, to or in support of one of these groups. And, again, material support. It's material support in support of, not to the group. And so any act that could be perceived as either having a natural tendency to affect the group or as promoting the interests of the group could be covered by the statute. Again, Your Honor, we're not we're in this in this case because of the prior HLP litigation, we have a limited argument. The argument is that as this court has found previously, there's a legitimate interest in cutting off funding for terrorism, absolutely. But there's also, and this court has held twice now in the HLP cases, there is also a legitimate interest in doing things like training people in international law, in advocating for human rights, in training people in how to advocate for human rights so they pursue lawful means to resolve their disputes as opposed to violence, in providing medical training and the like. And the key is that you've got to draw a line that clearly prohibits one and permits the other. And where Congress has failed to do that, this court has said you failed to do that. Not that you can't, but you just have to do it more clearly. And Congress has responded, and this court is in a dialogue, essentially, with Congress with respect to that. This statute, by contrast, has none, none of the terms that seek to draw a line between what should be prohibited and what can't be prohibited. It just doesn't. It uses terms like material support without a definition. It uses terms like services without a definition, just a list of examples. And that example, those examples cover precisely the conduct that this court in the prior cases said was constitutionally protected, providing educational services and international law, human rights training and the like. And therefore, we're not asking you to say to the government you can't go after financial support. We're simply asking this court to say what it said in HLP1 and in HLP2, namely that, yes, you can, but you have to do it with carefully tailored, narrowly defined terms and limits in order to avoid infringing on speech and association. And this statute, with all due respect, simply does not do that. Thank you. All right. Thank you. And the matter is submitted. And just for the record, Rafel Toma El Safar v. Mukasey, that was moved from the calendar. And that case was dismissed. And Ghostine V. Mukasey, that's been submitted on the brief. All right. And with that, we'll recess this court until 9 a.m. tomorrow morning. Thank you. All rise.
judges: Pregerson, Rymer, Korman